UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

FRANK MINIGAN, JR.

                Petitioner,

     -vs-

EDWARD R. DONNELLY, Superintendent,
Wende Correctional Facility,

             Respondent.

_____

**REPORT AND RECOMMENDATION**
**No. 01-CV-0026A(VEB)**

## I.  INTRODUCTION

On January 18, 2001, petitioner, Frank Minigan, Jr. ("Minigan"), filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 1989 conviction in New York State Supreme Court (Monroe County) on one count of second degree (felony) murder and two counts of first degree robbery. *See* Docket No. 1. The matter was before the Second Circuit Court of Appeals from April 2001 until February 2004 to determine whether the petition was a second or successive petition; apparently, Minigan had filed a prior petition which incorrectly had been determined to be untimely. In any event, the Second Circuit determined that the instant petition was not a second or successive petition and respondent was directed to respond. On or about November 1, 2006, Minigan moved for an evidentiary hearing, *see* Docket No. 25, which will be addressed in a separate order. Pursuant to 28 U.S.C. § 636(b), United States District Court Judge Richard Arcara referred this matter to the undersigned on November 15, 2006, for the issuance of a report and recommendation regarding Minigan's petition. *See* Docket No. 26.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Monroe County Indictment 142/88, filed on February 25, 1988, charged Minigan with

second degree (felony) murder (N.Y. Penal Law §§125.25(3), 20.00) and first degree robbery

(N.Y. Penal Law §§ 165.15(3), 20.00). The charges stemmed from Minigan's involvement, with

co-defendant Robert Mains ("Mains"), in the robbery and fatal stabbing of Alan Jopson

("Jopson") on February 10, 1988. The attack occurred as Jopson was leaving Lynam's Bar and

Grill on Webster Avenue, which he owned and at which he worked as a bartender. Trial counsel

succeeded in having Minigan's trial severed from that of co-defendant Mains.

Minigan's jury trial commenced on August 25, 1989, in Monroe County Supreme Court

before Justice Donald Mark. The prosecution's first witness was the county medical examiner,

who testified that Jopson sustained abrasions and lacerational tears to his face, a penetrating stab

wound to the chest, a stab wound to the right side of the face, and defensive wounds to the left

arm. T.295-98, 305.[1] The medical examiner stated that the chest wound had penetrated through

the subcutaneous fat tissue, which was "considerable" in Jopson, who apparently weighed 350

pounds. T.296. The stab wound to the chest penetrated through the pericardial sac, through the

right ventricle, and almost through the septum; this resulted in the loss of a large amount of

blood. T.297. The medical examiner opined that the cause of death was due to the penetrating

stab wound and the resultant desanguination. T.307. All of the stab wounds were the same

diameter and were caused by "[s]ome kind of sharp instrument" about five or six inches long.

T.303. On cross-examination, the medical examiner testified that the victim's blood-alcohol

content showed that he was legally intoxicated. T.308-09.

---

[1]        Citations to "T.___" refer to the trial transcript.

Lieutenant Albert Joseph ("Lt. Joseph") of the Rochester Police Department testified that he became involved in the investigation of the Jopson homicide at about 5:20 a.m. on February 10, 1988, when he reported to the Public Safety Building to interview Minigan. T.322. Lt. Joseph advised Minigan of the *Miranda* warnings, T.323; Minigan indicated that he understood them and would speak to Lt. Joseph, T.325-26, 328. According to Lt. Joseph, Minigan did not appear to be intoxicated or under the influence of drugs. T.327. The only detail that Lt. Joseph was able to observe "in relation to any type of a drug at all was [that] [Minigan's] lips seemed to have like a white casting or white powder on them that he constantly licked." *Id.*

Lt. Joseph explained to Minigan that Minigan already had been positively identified as one of the perpetrators. In response to Lt. Joseph's question about who the other perpetrator was, Minigan responded that "the only thing he knew about the second person was [that he was] a guy by the name of Bo." T.331. Minigan related that he and Bo had been at the house of Gabriele Krause ("Krause"), Minigan's girlfriend, at 106 Stout Street, and that at some point they had left and had gone to Lynam's Bar and Grill. T.332. Minigan stated that they had used the pay phone inside the bar and then left at about 2:00 a.m. Minigan and Bo were in the parking lot when "the big fat white guy came out," whom they knew to be the bartender at Lynam's Bar and Grill. *Id.* Jopson got into a station wagon and backed up, striking Minigan on the leg. *Id.* (Lt. Joseph testified that there had not been any prior report by Minigan of an injury to his leg. T.333) Jopson exited his car, and asked Minigan if he was okay. T.334. At that point, according to Minigan, Bo "punched the big fat white guy and he [Bo] fought with him." *Id.* Later during the interview, Minigan admitted that he "got mad" after being hit in the leg and said, "I struck him [Jopson] also." T.335-36.

According to Lt. Joseph, Minigan eventually said that Bo's last name was Mains, that he had known Mains for quite a while, and that he knew where Mains lived. T.335. Minigan maintained that he did not know anything about a knife or about the victim's wallet. T.336. Minigan refused to give a written statement, saying to Lt. Joseph, "I don't want you to write anything down." T.338.

The prosecution presented testimony of Mechel Rollow ("Rollow"), who happened to be visiting her boyfriend, Alfred LaMere ("LaMere"), on the night of the incident. LaMere lived across the street from Lynam's Bar and Grill. At about 2:25 a.m. or 2:30 a.m., while she and LaMere were watching television, she "heard a man yell for help." T.384. Rollow went to the window and looked outside; she could see the parking lot of Lynam's Bar and Grill from that vantage point. T.385, 386. Rollow testified that the parking lot was lit. She could see "two guys and big Al [Jopson], they were struggling." T.388. She continued, "One guy was struggling to get big Al down to the ground and the other one was punching him." *Id.*; *see also* T.390-91. Both of the assailants were black; one had "a black and red jacket with black striping" on it, and the other had a brown corduroy or suede jacket. T.389-90. Rollow recalled that one man was holding Jopson's arms while the other man was punching and kicking him. T.391-92. However, she could not say which man was doing what. *Id.* Rollow called to LaMere and told him that "they are beating up Al." T.430. On cross-examination and redirect, Rollow testified that she had gone to the window twice; the first time, she saw the men fighting, but everyone was standing up. When she returned to the window moments later, she saw "punches being thrown" and that is when she screamed. T.421.

LaMere and his mother's boyfriend, Adolph "Joe" Jusewicz ("Jusewicz"), grabbed a

crowbar and a baseball bat, respectively, and ran outside. T.392. Rollow testified that she

watched as Jopson was eventually forced to the ground, and the two assailants continued to

punch and kick him. T.394. LaMere's mother, who telephoned the police, made Rollow move

away from the window.

LaMere testified that after Rollow told him what was going on, he looked outside and

saw a black man in a black jacket go over to Jopson's car and turn off the ignition. At this point,

Jopson was on the ground, and a black man in a tan or brown corduroy jacket was over Jopson.

T.434-35. When LaMere and Jusewicz got to the parking lot, the two assailants were still there.

The man in the brown jacket started to approach Jusewicz and said something to the effect of,

"Do you want trouble?"and put his hand over his jacket pocket. T.472. Afraid for Jusewicz's

safety, LaMere grabbed Jusewicz's arm to stop him. LaMere related that the man in the black

jacket was backing away. When the police cars pulled up, the man in the brown jacket "trotted

off" while the man in the black jacket "ran" away. T.444-45.

When LaMere and Jusewicz went to check on Jopson, he kept saying, "My wallet, my

wallet, my wallet." T.448, 483. As he said this, Jopson reached into his back pocket. LaMere saw

that both of Jopson's front pants-pockets were turned inside-out. *Id.* Jopson had a "huge gash"

across his forehead and there was blood coming out of his mouth and nose. T.484.

Meanwhile, Officer James Noble testified that he spotted Minigan, wearing a "dark

winter jacket with red stripes" in the vicinity of Chamberlain and Parsells Streets, about two

blocks from the crime scene at about 2:35 a.m. T.542. Officer Noble apprehended him but

Minigan struggled and broke free at first; Officer Noble had to chase him and tackle him. After

Minigan was apprehended a second time, he continued to resist. When Officer Noble finally was

able to handcuff Minigan, he noticed that Minigan was wearing latex surgical gloves. T.545.

When the ambulance personnel arrived on the scene at 2:40 a.m., Jopson was trying to get up on his own. T.603. Once he got to his feet, he stated, "They stabbed me." T.604. At that point, the ambulance personnel removed Jopson's shirt and discovered the chest wound. Jopson fell to the ground and lost consciousness before the emergency personnel were able to get him into the back of the ambulance.

Gordon Neu ("Neu") testified that he also was bartending at Lynam's on the night of the murder. He and Jopson were playing darts and betting money on their games. Neu recalled that Jopson had his wallet that night and had cash on him. A wallet containing Jopson's personal papers, but no money, was found by Willie Foster, who did not remember where he had found it. Foster brought it to a dry-cleaner's; an employee there called the police and the connection to the murder was made. Jopson's girlfriend identified the wallet as his.

Minigan testified that on the night in question, he had the night off from his employment at a nursing home. Mains, who lived across the street from him, had come over and they had ingested some cocaine and consumed about three forty-ounce bottles of beer. T.773. (Minigan's girlfriend, Gabriele Krause also was present, but she did not testify at trial.) At about 1:30 a.m., Minigan and Mains left the apartment on Stout Street to go buy some more cocaine. T.773-74. They stopped at Lynam's Bar and Grill to use the telephone because neither Mains nor Minigan had a phone at their apartment. T.774. After using the phone, they went to the cocaine dealer's house, purchased some cocaine, and headed back to Minigan's apartment. T.775-76.

While they were walking through parking lot of Lynam's Bar and Grill, Minigan testified that he was struck on his left side, in the leg, by Jopson's car as it was backing up. T.776. Mains

yelled, "Stop." Jopson stopped his car and got out, and asked Minigan if he was alright. *Id.*
Minigan stated that he was alright but felt "dazed." He testified that he struck his head when he
fell to the ground, sustaining a bruise. T.779.

Minigan testified that while he was lying on the ground trying to collect himself, he
"heard a lot of loud yelling." T.780. He did not know what was going on, and did not observe
what was going on around him. *Id.* When Mains returned to him, Mains attempted to help him
up. Mains said, "I hit the man, I hurt him. Let's get out of here before somebody come [sic]."
T.781. As they walked by Jopson, lying on the ground, Mains "kept telling [Minigan] to come
on." T.782. Minigan then saw two people come across the street with bats; he "panicked and ran"
because he was afraid he was "going to be blamed for something [he] didn't do."*Id.* Minigan
stated that he had no trouble running and that the injury to his leg did not slow him down. T.783.
Minigan testified that he did not know that Mains had a knife that night. T.787. As he was
running away, Minigan testified, he changed his mind and turned around to go back and assist
Jopson. Minigan denied that he changed direction because he had seen a police officer or the
police cars setting up a perimeter. T.784. According to Minigan, he was wearing latex surgical
gloves underneath his white cotton work gloves because the cotton gloves had a hole in them and
it was cold outside. T.777.

The defense called Robert Mains, who, through his attorney, pleaded the Fifth
Amendment. The trial court dismissed Mains. The defense then called Investigator Leonard
Borriello ("Inv. Borriello"), who had interviewed Mains at his house on the night of the incident.
Mains informed Inv. Borriello that he had a knife when he left Minigan's apartment at about 1:30
a.m.; he had picked up the knife in the apartment. T.763.  Mains could not recall what he did

with the knife. *Id.* Mains then said to Inv. Borriello that "he didn't want to say anything further that would get him into trouble." T.764.

Alfred DiPasqua ("DiPasqua"), a forensic chemist specializing in forensic serology, testified for the prosecution that he performed testing on certain items of physical evidence, including Minigan's winter jacket (Defense Exhibit D), the latex gloves Minigan was wearing (People's Exhibit 16), and Minigan's ski hat (People's Exhibit 17). T.706-07. DiPasqua testified that, to a reasonable degree of scientific certainty, the blood stains on the rear portion of the jacket and on the sleeves had "protein enzymes which [we]re consistent with those particular enzymes which were found in the blood of Alan Jopson." T.713-14. Neither the hat nor the latex gloves exhibited any suspicious stains, so no serological testing was able to be performed on them. T.714-15. DiPasqua conceded on cross-examination that he could never say with total certainty that the blood on Minigan's jacket was actually the victim's blood. T.719.

Following the jury trial, Minigan was found guilty as charged and sentenced to concurrent terms of imprisonment, the longest of which was twenty-three (23) years to life. Represented by new counsel, Minigan appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court, arguing that the trial court improperly admitted hearsay testimony; the prosecution improperly elicited bolstering testimony from a police witness; the verdict was against the weight of the evidence; the sentence should be modified in the interest of justice; prejudicial photographs of the victim were improperly introduced; the show-up identification procedure was unduly suggestive; and the trial court improperly allowed the prosecutor to elicit from the interrogating officer that petitioner failed to inform him of his leg injury. *See* Petitioner's Appellate Brief, Respondent's Appendix of Exhibits ("Resp't App.") A at

1-30. The Appellate Division unanimously affirmed the judgment against Minigan on July 12,

1991. *People v. Minigan*, 175 A.D.2d 648, 572 N.Y.S.2d 578 (App. Div. 4th Dept. 1991). Leave

to appeal to the New York Court of Appeals was denied on September 18, 1991.

Minigan prosecuted a series motions to vacate the judgment pursuant to New York

Criminal Procedure Law ("C.P.L.") § 440.10. The first was filed on July 22, 1994 , and argued

that trial counsel failed object to raise a *Batson* challenge during jury selection and that the trial

court's rulings during jury selection were erroneous. *See* Petitioner's C.P.L. § 440.10 Motion

dated July 22, 1994, Resp't App. D at 34-50. This was denied by the trial court, which held that

all grounds asserted therein were matters of record and should have been raised on direct appeal.

*See* Monroe County Supreme Court Order dated February 2, 1995 (citing C.P.L. § 440.10(2)(c)),

Resp't App. E. at 52. Leave to appeal was denied by the Appellate Division on May 24, 1995.

*See* Resp't App. F at 53.

Minigan's second C.P.L. § 440.10 motion was filed in 1996. There are two sets of motion

papers in Respondent's Appendix of Exhibits; one merely bears the date of "1996," see Resp't

App. K, and one is dated August 2, 1996, *see* Resp't App. L. The Court assumes that both sets of

papers were submitted together by Minigan. Minigan argued that the grand jury testimony was

insufficient to support the indictment, the trial evidence was insufficient to support the

conviction, and trial counsel failed to provide effective assistance. *See* Monroe County Supreme

Court Order dated January 3, 1997, Resp't App. P. In particular, Minigan faulted trial counsel for

failing to object to the excusal of the two black jurors from the panel of prospective jurors,

failing to object to the swearing-in of a biased juror; and failing to object to the trial court's in-

chambers discussion with a juror, held in defendant's absence, concerning the ability of that juror

to continue deliberations after receiving unexpected news of the death of her mother-in-law. *See* Petitioner's C.P.L. § 440.10 Motion dated August 6, 1996, Resp't App. L at 144-76. Minigan also claimed that the evidence against him was legally insufficient and that his conviction was based on perjured testimony offered by several prosecution witnesses. Justice Mark denied the motion, again relying on C.P.L. § 440.10(2)(c), because all of the grounds raised therein were "sufficiently set forth factually in the trial record to provide an adequate basis for appellate review." Monroe County Supreme Court Order dated January 3,1997, Resp't App. P at 226. Leave to appeal was denied by the Appellate Division, Fourth Department, on May 1, 1997. *See* Resp't App. S.

Minigan instituted his third C.P.L. § 440.10 motion on November 2, 1997, alleging that the trial court "interfere[d] with the natural flow of judicial process and den[ied] defendant due process of law" by "in essence, aid[ing] the district attorney in his quest to prove the theory that he presented to the Jury." Petitioner's C.P.L. § 440.10 Motion dated November 2, 1997, Resp't App. W at 284. Minigan complains that the trial court "redundantly repeated the words; [sic] "NON-KILLER"., PP. 983-991. Instead of reading the jury instructions form the NEW YORK COMMITTE [sic] ON JURY INSTRUCTIONS." *Id.* According to Minigan, this had a "bolstering effect" on the jury. *See id.* Minigan also argued that the trial court erroneously refused to charge the jury on requested lesser included offenses, and that the identification testimony was unreliable. *See id.*, Resp't App. W at 288, 290-91. *See* Justice Mark denied the motion on March 6, 1998, observing that "[t]he defendant and his inmate law clerk either do not understand or choose to disregard the language of [C.P.L. §440.10](2)(c)[.]" Monroe County Supreme Court Order dated March 6, 1998, Resp't App. Y at 360. Justice Mark relied solely on

C.P.L. § 440.10(2)(c) to deny the motion, finding that "[a]ll of the matters of which the defendant

complains . . . are matters which appear *on the record*. In fact, the defendant furnishes the basis

upon which a denial of his motion may rest by attaching a copy of the transcript of the trial to his

motion, vividly demonstrating that all these matters are in the record." *Id.*, Resp't App. Y at 360

(emphasis in original).

Minigan's fourth C.P.L. 440.10 motion was brought pursuant to C.P.L. §

440.10(1)(h)(3)(c) on June 25, 2001, and claimed that the verdict was against the weight of the

evidence and was based legally insufficient evidence; that the trial court failed to instruct the jury

on lesser included offenses; and that trial counsel was ineffective in failing to raise a *Batson*

challenge, failing to raise a "fair cross section" challenge to the jury panel, and failing to object to

the removal of a black juror for cause. Petitioner's C.P.L. § 440.10 Motion dated June 25, 2001,

Resp't App. Z-4 at 408-60.  On November 1, 2001, Justice Mark denied the fourth C.P.L. §

440.10 motion, holding that

> Once again, it is clear that all of these matters are record matters, necessitating a
> denial of this motion as a matter of law. Pursuant to CPL § 440.10(2), the Court
> must deny an Article 440 application whenever there are sufficient facts in the
> record to permit adequate appellate review of the issues raised, and whenever the
> defendant nevertheless fails to raise those issues on appeal. In other words, Article
> 440 applications are not a substitute for the appellate process, but are designed to
> afford a defendant review of only those issues that are not otherwise reviewable
> on appeal because the record does not have enough facts to determine them. This
> is obviously not the situation in this case, as can be seen by a perusal of
> defendant's motion papers alone.

Resp't App. Z-9 at 478 (internal citations omitted). The trial court also denied the motion under

the permissive sections of C.P.L. § 440.10(3)(b) and (c), because the grounds raised in the

present motion had been raised in previous motions under C.P.L. § 440.10. *See id.*, Respt' App.

Z-9 at 478-79 (citations omitted). The Appellate Division, Fourth Department, denied leave to

appeal on August 2, 2002. *See* Resp't App. Z-17 at 515.

Minigan also apparently filed several applications for a writ of error *coram nobis*. One

was filed on April 22, 1998.[2]  Minigan argued that appellate counsel's performance was

ineffective, apparently because counsel failed to raise on direct appeal all of the issues that

Minigan had raised in support of his collateral motions to vacate under C.P.L. § 440.10. *See*

Petitioner's *Coram Nobis* Application dated April 22, 1998, Resp't App. Z at 362-98. The

Appellate Division, Fourth Department summarily denied the application on June 10, 1998. *See*

Resp't App. Z-3 at 402. Also in Respondent's Appendix of Exhibits is an order from the Fourth

Department dated July 3, 2002, denying an application for a writ of error *coram nobis* filed on

May 14, 2002; however, respondent has not included a copy the motion papers to which this

order refers. Minigan sought leave to reargue this May 2002 *coram nobis* application, *see* App.

Z-14 at 494-96; App. Z-16 at 501-14, and he also apparently filed a notice of appeal, *see* App. Z-

15 at 497. The Fourth Department denied his motion for reargument on October 1, 2002. *See*

Resp't App. Z-18 at 516. Minigan sought leave to appeal to the Court of Appeals as to both the

denial of the *coram nobis* and the denial of reargument; both applications were denied. *See*

Resp't App. Z-22 at 527; App. Z-23 at 528.

Minigan filed a timely petition for a writ of habeas corpus in this Court. Respondent has

answered the petition and has asserted the defense of procedural default as to a number of

---

[2]        Minigan indicated in his April 1998 *coram nobis* application that the Appellate Division, Fourth Department, had denied his application for a writ of error *coram nobis*. However, Minigan did not provide a date on which that earlier *coram nobis* application was filed, and the motion papers were not included in Respondent's Appendix of Exhibits.

Minigan's claims, as discussed more fully below. For the reasons that follow, the Court

recommends that Minigan's petition for a writ of habeas corpus be denied.

## III.   DISCUSSION

### A.   The Doctrine of Procedural Default

Under the "adequate and independent" state ground doctrine, a federal court will not

review a question of federal law decided by a state court if the decision of that court rests on a

state law ground, be it substantive or procedural, that is independent of the federal question and

adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 728-29, 111 S. Ct.

2546, 2553-54 (1991). The doctrine applies to bar federal habeas review when a state court has

declined to address a petitioner's federal claims because the petitioner has failed to meet a state

procedural requirement. *Id.* at 729-30. In such cases, the state judgment is said to rest on

independent and adequate state procedural grounds. *Id.* at 730 (citations omitted). Furthermore,

this proscription applies even in those circumstances where a state court expressly relies on a

procedural default as an independent and adequate state-law ground but, nevertheless, has ruled

in the alternative on the merits of the federal claim. *See Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d

Cir. 1990).

A habeas corpus petitioner, however, may overcome a procedural default created by the

state court's invocation of an "independent and adequate" basis for its decision by (1) showing

cause for the default and prejudice attributable thereto, or (2) by demonstrating that a

fundamental miscarriage of justice will ensue if the claim is not reviewed by the habeas court.

*See Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043 (1989). The "fundamental

miscarriage of justice" exception requires the petitioner to make a factual showing that he is

"actually innocent" of the crime for which he was convicted. *See id.* It bears noting that "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

**B.      Analysis of Petitioner's Claims**

**1.      Claims in Petitioner's Habeas Petition (Docket No. 1)**

In his habeas petition (Docket No. 1), Minigan asserts the following four claims: (1) the trial court erroneous allowed hearsay testimony (*i.e.*, the victim's statement to witnesses, "My wallet, my wallet."); (2) the trial court improperly allowed the prosecutor to elicit "bolstering" testimony from Lt. Joseph about the fact that an eyewitness had identified Minigan; (3) the verdict was against the weight of the evidence; and (4) the trial court improperly failed to suppress the identification by LaMere because it was the result of an unduly suggestive show-up identification procedure, and the police should have conducted a line-up identification procedure instead. All of these claims were raised in appellate counsel's brief on direct appeal and appear to be fully exhausted. As discussed further below, respondent contends that the first two claims are procedurally defaulted because the state court ruled that they were unpreserved due to trial counsel's failure to make a timely objection.

**a.      Improper introduction of hearsay testimony**

Eyewitnesses Alfred LaMere and Alfred Jusewicz were allowed to testify that they had a brief conversation with Jopson, the victim, after the assailants had fled, in which Jopson repeated, "My wallet, my wallet." No objection was registered by trial counsel at the time. On direct appeal, appellate counsel argued that the admission of the statements was not harmless error. According to Minigan, because he was only charged with felony murder, it was "absolutely

essential to the prosecution's theory that it prove beyond a reasonable doubt that the victim met

his death during the course of a robbery committed on the victim's person." Resp't App. A at 14-

15. On direct appeal, the Appellate Division held that "defendant failed to register an objection

and thus has failed to preserve any alleged error for review (*see*, CPL 470.05[2])." *People v.*

*Minigan*, 175 A.D.2d 648, 572 N.Y.S.2d at 579.

Respondent contends that this claim is procedurally defaulted due to the Appellate

Division's reliance upon New York's "contemporaneous objection rule," set forth in C.P.L. §

470.05(2). The Court agrees that the Appellate Division's reliance upon a state procedural bar

rule here is clear. The Appellate Division relied solely on the lack of preservation to deny the

claim; it did not rule, in the alternative, on the claim's merits. Thus, the state ground here

invoked certainly was an "independent" basis for the Appellate Division's decision. The

remaining question is whether the procedural bar relied on by the Appellate Division is

"adequate" to preclude federal habeas review.

A procedural bar is adequate only if it is based on a rule that is "firmly established and

regularly followed" by the state courts. *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S.Ct. 850,

112 L.Ed.2d 935 (1991); *accord*, *e.g.*, *Cotto v. Herbert*, 331 F.3d 217, 239-41 (2d Cir. 2003).

Thus, the parties to an action must have notice of the state procedural rule and the rule must be

applied consistently in similar circumstances. *See id.*  In other words, "the adequacy of a state

procedural bar is determined with reference to the 'particular application' of the rule;" it is not

enough that the rule generally serves a legitimate state interest. *Cotto v. Herbert*, 331 F.3d at 241

(quoting *Lee v. Kemna*, 534 U.S. 362, 387, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)). Therefore,

an inquiry into whether the application of a procedural rule is "firmly established and regularly

followed" in the specific circumstances presented in a case includes "an evaluation of the

asserted state interest in applying the procedural rule in such circumstances."  *Id.*

The purpose of New York's contemporaneous objection rule, embodied in C.P.L. §

470.05(2),[3] is "to fairly apprise the court and the opposing party of the nature and scope of the

matter contested." *People v. Jones*, 81 A.D.2d 22, 41-42, 440 N.Y.S.2d 248, 261 (App. Div.2d

Dep't 1981). The New York Court of Appeals has explained that this rule "'require[s], at the very

least, that any matter which a party wishes the appellate court to decide have been brought to the

attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the

problem and thereby avert reversible error.'" *Garcia v. Lewis*, 188 F.3d 71, 78 (2d Cir. 1999)

(quoting *People v. Luperon*, 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 737-38, 647 N.E.2d 1243,

1247-48 (N.Y. 1995)). Both the Second Circuit and the Supreme Court have recognized that

procedural rules such as New York's contemporaneous objection rule serve a legitimate state

interest. *Id.* (citing, *e.g.*, *Wainwright v. Sykes*, 433 U.S. 72, 88, 97 S.Ct. 2497, 53 L.Ed.2d 594

(1977) (noting the "many interests" that contemporaneous objection rules serve, such as

"enabl[ing] the record to be made . . .  when the recollections of witnesses are freshest," enabling

the judge "to make the factual determinations necessary for properly deciding the federal

constitutional question," and "making a major contribution to finality in criminal litigation" by

leading to avoidance of constitutional error); *Peterson v. Scully*, 896 F.2d 661, 663 (2d Cir.

1990)). Consequently, the Second Circuit has "observed and deferred to New York's consistent

---

[3]        "For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court
during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the
time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively
changing the same. Such protest need not be in the form of an 'exception' but is sufficient if the party made his
position with respect to the ruling or instruction known to the court. . . ." N.Y. Crim. Proc. Law § 470.05(2).

application of its contemporaneous objection rules." *Id.* (citing *Bossett v. Walker*, 41 F.3d 825,

829 n. 2 (2d Cir.1994) (respecting state court's application of New York C.P.L. § 470.05(2) as

adequate bar to federal habeas review), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d

316 (1995); *Fernandez v. Leonardo*, 931 F.2d 214, 216 (2d Cir.1991) ("It is undisputed that

[petitioner's] failure to note this objection [under C.P.L. § 470.05(2))] constituted a procedural

default under New York law.")). It thus appears to be beyond argument that the requirement of a

timely objection pursuant to C.P.L. § 470.05(2) with respect to allegedly improper evidence is a

"firmly established and regularly followed" procedural rule in New York. Therefore, the

Appellate Division's reliance on C.P.L. § 470.05(2) to find the hearsay claim to be unpreserved

was an "adequate" state ground.

In order to overcome the procedural default created by the Appellate Division's dismissal

of his claim on an adequate and independent state ground, Minigan must show both cause and

prejudice. Notably, Minigan cannot demonstrate that he was at all prejudiced by trial counsel's

failure to preserve an objection to this evidence because, as a matter of state evidentiary law, the

trial court in all likelihood would have permitted the testimony under the "excited utterance" or

"spontaneous declaration" exception to the rule against hearsay. *See People v. Jusino*, 152 A.d.2d

744, 745, 544 N.Y.S.2d 195, 196 (App. Div. 2d Dept. 1989) ("In any event, we note that the

complainant's statement, uttered less than a block from and only moments after the commission

of the crime, was admissible under the "excited utterance" exception to the hearsay rule[.]")

(citing *People v. Brown*, 70 N.Y.2d 513, 518, 522 N.Y.S.2d 837, 517 N.E.2d 515 (N.Y. 1987)

("An excited utterance is one made 'under the immediate and uncontrolled domination of the

senses, and during the brief period when consideration of self-interest could not have been

brought fully to bear by reasoned reflection.'") (quotation omitted)); *see also People v. Taylor*, 117 A.D.2d 829, 499 N.Y.S.2d 151, 151 (App. Div. 2d Dept. 1986) (holding that testimony that victim wrote his attacker's name in victim's blood was admissible under either dying-declaration or excited-utterance exceptions to hearsay rule, where writings were made within very short period of time from attack upon victim, injuries rendered victim *in extremis* and he expressed clear sense of impending death, and victim was still under stress of attack which was in nature of an extremely startling event which occurred moments before the writings); *People v. Trotter*, 255 A.D.2d 925, 925, 683 N.Y.S.2d 676, 676 (App. Div. 4th Dept. 1998) (holding that robbery victim's statements to a police officer were admissible under the excited utterance exception to the hearsay rule; victim made the statements within 20 minutes of the assault, while he was still at the scene being tended to by medical personnel and was still under the stress of the startling event, and therefore the remarks were not made "under the impetus of studied reflection"). Thus, as the above-cited New York state precedent makes clear, it appears that there was no error of state evidentiary law.

Furthermore, there was no error of federal constitutional law; the Second Circuit has held that "excited utterances" are recognized as a hearsay exception pursuant to the Federal Rules of Evidence. *See*, *e.g.*, *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998) ("An excited utterance is a statement 'relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'") (quoting Fed. R. Evid. 803(2)). It is well-settled that federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The fact that there was no error of federal constitutional magnitude provides further support for finding that

Minigan will not be prejudiced by the procedural default of this claim.

"[T]he cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 1470 (1991) (quoting *Murray v. Carrier*, 477 U.S. 467, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)); *accord Bloomer v. United States*, 162 F.3d 187, 191 (2d Cir. 1998). Because Minigan has not shown that he would be prejudiced by his inability to assert his claim at this time, the Court need not consider whether he has shown cause for his failure to comply with New York's contemporaneous objection rule. *See Engle v. Isaac*, 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 1575 (1982) ("Since we conclude that these respondents lacked cause for their default, we do not consider whether they also suffered actual prejudice. Respondents urge that their prejudice was so great that it should permit relief even in the absence of cause. *Sykes*, however, stated these criteria in the conjunctive and the facts of these cases do not persuade us to depart from that approach."); *McCleskey v. Zant*, 499 U.S. at 502. Finally, Minigan has not made the factual showing of actual innocence required to invoke the "fundamental miscarriage of justice exception." This claim accordingly should be dismissed as procedurally barred.

### b.    Improper "bolstering" of a prosecution witness' testimony

Minigan contends that the trial court improperly allowed the prosecutor to "bolster" the testimony of Lt. Joseph, by having that witness convey to the jury the substance of out-of-court statements made to him to the effect that the eyewitnesses had identified Minigan. On direct appeal, the Appellate Division held that "[d]efense counsel's general objection to such testimony on hearsay grounds was insufficient to preserve that issue for our review." *People v. Minigan*,

175 A.D.2d at 648. Respondent argues that the Appellate Division's rejection of the bolstering claim based on petitioner's failure to comply with a state preservation rule was an independent and adequate state ground which bars federal habeas review of the claim. Although the Appellate Division did not refer specifically to New York's "contemporaneous objection" rule, embodied in C.P.L. § 470.05(2), when it disposed of this claim, it is apparent that the court was relying on that rule.

The Court agrees with respondent that the Appellate Division's reliance upon a state procedural bar rule here is clear. The Appellate Division relied solely on the lack of preservation to deny the claim; it did not rule, in the alternative, on the claim's merits. Therefore, the state ground here invoked, *i.e.*, the contemporaneous rule, served as an "independent" basis for the Appellate Division's decision. And, for the reasons discussed below, the procedural bar relied on by the Appellate Division was an "adequate" ground, as well.

New York's highest court has held that general objections, that is, those that fail to advise the trial court of the specific legal basis for the objection, are insufficient to preserve an issue for appellate review. *See People v. Tevaha*, 84 N.Y.2d 879, 881, 620 N.Y.S.2d 786 (N.Y. 1994) (finding that stating the word "objection," without more, is insufficient to preserve a claim for appellate review); *People v. Nuccie*, 57 N.Y.2d 818, 819, 441 N.E.2d 1111, 455 N.Y.S.2d 593 (N.Y. 1982) (holding that general, unelaborated objection to allegedly prejudicial and inflammatory statements made by prosecutor in his summation was inadequate to preserve that issue for review, and that the contentions regarding asserted errors in trial court's jury instructions had not been preserved for review since defense counsel failed to alert court to specific theories advanced as basis for reversal). Minigan has not identified how the Appellate

Division's application, to his case, of New York's contemporaneous objection rule, and its proscription against general objections was a departure from the regular application of this rule to similar cases. Thus, it appears to this Court that in New York, the rule that a general objection is insufficient to preserve a specific evidentiary claim for appellate review is "firmly established and regularly followed" by the courts of that state.

Therefore, federal habeas review is precluded unless Minigian can demonstrate "cause" for the default and "prejudice" resulting from the federal habeas court's failure to consider the claim, or show that "failure to consider the claims will result in a fundamental miscarriage of justice." *See Coleman*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) 501 U.S. at 750; *Lee v. Kemna*, 534 U.S. at 387.

Plainly, prejudice resulting from the procedural default of this claim is lacking because alleged "bolstering" of a prosecution witness' testimony does not state a constitutional claim redressable on federal habeas. *See Benitez v. Senkowski*, No. 97 Civ. 7819(DLC),1998 WL 668079, at *5 (S.D.N.Y. Sept. 17, 1998) (bolstering claim does not state federal claim); *Ayala v. Hernandez*, 712 F.Supp. 1069, 1074 (E.D.N.Y. 1989) (police "bolstering" of eyewitness identification testimony held to be, at most, violation of state rule, and thus not could not form basis for constitutional claim); *Kanani v. Phillips*, No. 03 Civ. 2534PKCAJP, 2004 WL 2296128, at *21 (S.D.N.Y. Oct. 13, 2004 (Report & Recommendation) (stating that the rule forbidding "bolstering" is a state law standard, and a claim that a witness' testimony constituted improper bolstering does not state a federal constitutional claim cognizable on habeas corpus) (citations omitted); *Orr v. Schaeffer*, 460 F.Supp. 964, 967 (E.D.N.Y. 1978) ("This Circuit has never regarded the practice [of bolstering] as inimical to trial fairness."); *Diaz v. Greiner*, 110 F.

Supp.2d 225, 234 (S.D.N.Y.2000) ("Bolstering claims have been (expressly) held not to be cognizable on federal habeas review.") (citing *Styles v. Zandt*, No. 94 Civ. 1863 (MGC), 1995 WL 326445, at *5 (S.D.N.Y. May 31, 1995) (stating that "a claim of improper 'bolstering' is not a cognizable basis of federal habeas relief"); *Vega v. Berry*, No. 90 Civ. 7044 (LBS), 1991 WL 73847, at *2 (S.D.N.Y. Apr. 29, 1991)("[A]lthough bolstering is a practice prohibited in various states, including New York, the practice is not forbidden by the Federal Rules of Evidence and is not sufficiently prejudicial to deprive a defendant of his due process right to a fair trial."); *Malik v. Khoenan*, No. 94 CIV. 8084 (LLS), 1996 WL 137478, at *4 (S.D.N.Y.  Mar. 26, 1996)("a claim of bolstering is not a federal constitutional claim cognizable on habeas review"); *Snow v. Reid*, 619 F. Supp. 579, 582 (S.D.N.Y. 1985).

Because Minigan has not shown that he would be prejudiced by his inability to assert his claim at this time, the Court need not consider whether he has not shown cause for his failure to comply with New York's contemporaneous objection rule. *See Engle v. Isaac*, 456 U.S. at 134 n. 43; *McCleskey v. Zant*, 499 U.S. at 502. This claim should be dismissed as procedurally defaulted.

### c.    The verdict was against the weight of the evidence

Minigan argues that the verdict was against the weight of the evidence. *See* Petition (Docket No. 1); see also Petitioner's Supplemental Memorandum of Law (Docket No. 21). This claim was raised on direct appeal, *see* Resp't App. A at 18-21, and summarily rejected by the Appellate Division as "without merit," *see People v. Minigan*, 175 A.D.2d 648, 572 N.Y.S.2d at 579. Although Minigan cites provisions of the federal constitution in his habeas pleadings to support his weight-of-the-evidence argument, that does not transform the claim into a federal

constitutional claim cognizable on federal habeas review.

A challenge to a verdict based on the *weight* of the evidence is different from a challenge based on the *sufficiency* of the evidence; both state and federal courts in New York have recognized that an argument based on the "weight of the evidence" is purely a state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles. *People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 763 (1987)). Habeas corpus review is not available to remedy alleged error of state law, however. *See* 28 U.S.C. § 2254(a); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).  Consequently, federal courts in this Circuit consistently have held that weight-of-the-evidence claims are not cognizable on federal habeas review since such claims allege only an error of state law, for which habeas review is not available. *E.g.*, *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (holding that petitioner's weight of the evidence claim was not cognizable on federal habeas review); *Douglas v. Portuondo*, 232 F. Supp.2d 106, 116 (S.D.N.Y. 2002) (same); *Correa v. Duncan*, 172 F. Supp.2d 378, 381 (E.D.N.Y. 2001) (same); *Soundiata v. Artus*, No. 04 CIV 1412 DAB KNF, 2007 WL 143061, *5 (S.D.N.Y. Jan. 12, 2007) (adopting Report and Recommendation) (holding that petitioner's weight of the evidence claim was not cognizable on federal habeas review) (citing *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) ("[A] writ of habeas corpus cannot be used to review the weight of evidence[,]"), *aff'd*, 263 U.S. 255, 44 S.Ct. 103 (1923)). Because Minigan's challenge to the weight of the evidence supporting his conviction presents nothing more than an issue of state statutory law, it should be dismissed as not cognizable on federal habeas review.

        **d.**        **Failure to suppress results of show-up identification procedure and**

**erroneous admission of in-court identification testimony**

Minigan contends that the pre-trial show-up identification procedure in which LaMere identified him should have been suppressed as unduly suggestive, and that LaMere's in-court identification of Minigan was irreparably tainted by the suggestive show-up procedure. He also argues that the police should have conducted a line-up instead of a show-up procedure. On direct appeal, the Appellate Division rejected these claims summarily as "without merit." *People v. Minigan*, 175 A.D.2d 648, 572 N.Y.S.2d at 579.

The admission of identification testimony violates due process only when the identification is "'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir.) (quoting *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)), *cert. denied*, 513 U.S. 862, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *see also Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

In order to determine whether identification testimony is constitutionally valid, the court first must determine whether the procedure by which the initial identification was obtained was impermissibly suggestive. *Bautista*, 23 F.3d at 729-30. Even where the procedure is unnecessarily suggestive, exclusion of the identification is not necessarily required. The court must determine "'if, when viewed in the totality of the circumstances, [the out-of-court identification] possesses sufficient indicia of reliability,'" notwithstanding the suggestiveness of the procedure. *Id.* (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991)); *see also Manson*, 432 U.S. at 114 ("[R]eliability is the linchpin in demonstrating the admissibility of identification testimony [.]").

Thus, the central inquiry is "whether under the totality of the circumstances the identification was reliable." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).  In the absence of either element, there is no constitutional error. *See Bautista*, 23 F.3d at 729-30.

The Supreme Court has articulated five factors to be considered when evaluating the reliability of identification procedures: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. at 199-200; *see also Manson v. Brathwaite*, 432 U.S. at 114. A reviewing court must balance these five factors against the "corruptive effect" of the suggestive identification procedure itself in order to determine whether the identification testimony should have been suppressed. *Manson*, 432 U.S. at 114.

Turning first to the suggestiveness of the identification procedures, Minigan was seated in the back of the patrol car of the officer who had apprehended him. LaMere approached the vehicle, looked inside, and walked over to one of the police officers and indicated that Minigan was one of the perpetrators.  Federal courts have differed as to whether similar circumstances are unduly suggestive. The practice of showing a suspect singly to a witness for the purpose of identification shortly after a crime—commonly known as a "show-up"—is not inherently unconstitutional. However, as the Supreme Court noted in *Stovall v. Denno*, the "show-up," or "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." 388 U.S. at 302. A show-up, as opposed to a line-up or photo array, has been described as "inherently suggestive" because the defendant is

-25-

presented singly to the witness by the police. *Brisco v. Phillips*, 376 F. Supp.2d 306, 313 (E.D.N.Y. 2005) (citing *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996)).

The Second Circuit has held that where, as here, the police are making a prompt and reasonable effort to identify the perpetrator, handcuffs and police custody are "necessary incidents of an on-the-scene identification" that do not "render the pre-trial identification procedure unnecessarily suggestive." *Bautista*, 23 F.3d at 730 (show-up not unnecessarily suggestive where defendant was presented to the witness "in handcuffs; at night; in the custody of police officers; with his face lit by flashlights; and in the presence of [an officer] who, each time [the witness] identified a suspect, radioed to his fellow officers, '[I]t's a hit'"); *see also United States v. Butler*, 970 F.2d 1017, 1021 (2d Cir.) (identification proper where suspects were brought to victim who was sitting in a police car), *cert. denied*, 506 U.S. 980 (1992); *United States v. Sanchez*, 422 F.2d 1198, 1199-1200 (2d Cir. 1970) (police drove suspects by witnesses at the scene of the crime); *United States v. Ortiz*, No. 99 CR. 532 DC, 2000 WL 37998, at *1 (S.D.N.Y. Jan. 18, 2000) (defendants were in handcuffs, standing next to a marked police car, and accompanied by uniformed police officers); *Torrez v. Sabourin*, No. 00 CIV. 3286(AGS), 2001 WL 401444, at *5 (S.D.N.Y. Apr. 19, 2001) (Report and Recommdenation) (identification not unduly suggestive where complainant identified defendant while he was on his hands and knees surrounded by police officers and patrol cars); *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997) (The officers' actions did not encourage any identification of Livingston as the murderer. The eyewitnesses to the crime were present when Livingston arrived at the crime scene and some on their own initiative walked over to the police car where they identified Livingston as the assailant.). *But see Van Pelt v. Keane*, No. CV-90-2072, 1991 WL 81973, *6 (E.D.N.Y

May 6, 1991) ("In this case, defendant was identified by two witnesses at the scene of the crime. At the time he was identified he was seated in the back of a police car, alone, handcuffed, having just been captured during a search the witnesses knew the police were conducting for the robbers. There is no question that this 'show-up' was unnecessarily suggestive.") (citing *Archuleta v. Kerby*, 864 F.2d 709, 710-11 (10th Cir. 1989) (holding that show-up identification of defendant seated in handcuffs in rear of police car among uniformed officers was unnecessarily suggestive); *United States v. Shaw*, 894 F.2d 689, 692 (5th Cir. 1990) (concluding that show-up identification of defendant after removal from FBI vehicle in handcuffs at scene of crime was unnecessarily suggestive)).

At the suppression hearing, Officer Noble testified that about five minutes after hearing Officer Kennedy's broadcast of a description of the suspects, he saw and apprehended a black male matching the description, *i.e.*, Minigan. Transcript of September 21, 1988 Hearing ("9/21/88 Tr.") at 41. Officer Noble handcuffed Minigan, placed him in the backseat of the patrol car and drove back to the crime scene. *Id.* at 42. Officer Noble exited his car at one point to help assist the ambulance personnel; when he returned the patrol car a few minutes later, a "male white [LaMere] approached the vehicle[.]" *Id.* at 46. Officer Noble exited the vehicle, and LaMere "stated to [him] that Sergeant Woods had asked him to come over and take a look at the person [he] had in [his] car." *Id.*; *see also id.* at 49.

Officer Noble testified that the interior dome light in his patrol car was on at the time. He turned on his flashlight and shined it on Minigian in the backseat. *Id.* at 48. LaMere "looked at the person, walked away." *Id.* LaMere then informed Officer Noble and Sergeant Woods "that that's the man that he saw standing over the body [of the victim]." *Id.*; *see also id.* at 90. Officer

Noble had no conversation with LaMere prior to LaMere's approaching the patrol car. *Id.* at 49.

Officer Noble testified that he did not say anything to indicate to LaMere that he had a suspect in

his car. *Id.* at 49-50. On cross-examination, Officer Noble testified that he returned to the crime

scene after hearing the initial broadcast of the suspects' descriptions no "more than twenty

minutes" later. *Id.* at 69.

      Without a doubt, there was some degree of suggestiveness in the show-up procedure

conducted here; however, given the weight of the precedent in this Circuit, the Court does not

find that the procedure was unduly suggestive. In any event, even if it were unduly suggestive,

LaMere's identification had sufficient indicia of reliability and therefore was properly admitted.

LaMere had ample opportunity to view Minigan at the time of the crime; he and Jusewicz

confronted Minigan and Mains in the well-lit parking lot of Lynam's Bar and Grill before the two

perpetrators had fled the scene. According to LaMere, Minigan was backing away from him,

meaning that Minigan's face obviously was visible. There is no suggestion that LaMere was not

paying close attention; he had just witnessed a violent beating of a man whom he knew

personally. LaMere described one of the assailants as a black male wearing a black jacket; the

description was not overly detailed, but the Second Circuit explicitly has held that similar

descriptions were sufficiently complete. *See Chavis v. Henderson*, 638 F.2d 534 (2d Cir. 1980).

LaMere demonstrated certainty in his identification of Minigan, immediately indicating to the

police officers that Minigan was one of the perpetrators. Finally, between ten and twenty minutes

elapsed between LaMere's viewing of Minigan in the parking lot immediately after the assault

and the identification. *E.g.*, 9/21/88 Tr. at 15, 69. That brief time interval strongly supports a

finding of reliability. *See Chavis*, 638 F.2d at 537 ("That [the victim] Mrs. Soto's identification

of appellee as the robber took place within one-half hour of their meeting in the lobby and the elevator is strongly supportive of reliability.") (citing *United States ex rel. Springle v. Follette*, 435 F.2d 1380, 1383 (2d Cir. 1970) (where the interval between crime and identification was one-half hour, "[t]his fact of immediacy makes it much more likely that the witness will have a fresh recollection of the appearance of the suspect and hence that the identification will be accurate"), *cert. denied*, 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 331 (1971).

For the foregoing reasons, the Court finds that after reviewing the evidence in the five areas found significant by the Supreme Court in *Neil v. Biggers*, 409 U.S. at 199-200, under the totality of the circumstances the identification of Minigan by LaMere was sufficiently reliable to meet the requirements of due process. Therefore, the Court recommends that this claim regarding the identification of petitioner by an eyewitness should not provide a basis for habeas relief.

## 2.    Claims Raised in Petitioner's Memorandum of Law (Docket No. 2)

In Petitioner's Memorandum of Law ("Pet'r Mem") (Docket No. 2), Minigan has set forth the following additional claims for relief: ineffective assistance of trial counsel; perjury by prosecution witnesses; insufficiency of the evidence; erroneous jury instruction on intent; and erroneous denial of request to charge lesser included offenses.

### a.    Ineffective assistance of trial counsel

Minigan contends that his trial counsel was ineffective in "fail[ing] to contest discriminatory jury selection process, fail[ing] to attend *in chamber* voir dire of deliberating juror, and fail[ing] to challenge for cause juror of questionable partiality[.]" Pet'r Mem. at i (Docket No. 2). All of the allegations raised in support of these claims were argued in Minigan's various C.P.L. § 440.10 motions in state court and consistently denied by the trial court on the

basis of C.P.L. § 440.10(2)(c) because sufficient facts appeared on the record to have allowed

Minigan to raise the claims on direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c).[4]

Respondent now argues that the trial court's reliance on C.P.L. § 440.10(2)(c) to dismiss all of

Minigan's claims of ineffective assistance of trial counsel constitutes an "adequate and

independent" state ground for decision, foreclosing habeas review.

The Court agrees with respondent. It is true that "New York courts have held that some

ineffective assistance claims are 'not demonstrable on the main record' and are more appropriate

for collateral or post-conviction attack, which can develop the necessary evidentiary record."

*Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 1983) (quoting *People v. Harris*, 109 A.D.2d 351,

360, 491 N.Y.S.2d 678, 687 (App Div. 2d Dept.) (collecting cases), *appeal denied*, 66 N.Y.2d

919, 489 N.E.2d 779, 498 N.Y.S.2d 1034 (N.Y. 1985) and citing *People v. Brown*, 45 N.Y.2d

852, 853-54 382 N.E.2d 1149, 410 N.Y.S.2d 287 (N.Y. 1978)). Where, however, the alleged

errors that are the basis for a petitioner's ineffectiveness claim are "particularly well-established

in the trial record," *id.*, federal courts in New York have held that a state court's reliance on

C.P.L. § 440.10(2)(c) to dismiss such an ineffective assistance claim operates as a procedural bar

to a subsequent collateral attack by means of federal habeas. *E.g.*, *Sweet v. Bennett*, 353 F.3d at

139 (finding that C.P.L. § 440.10(2)(c) was an adequate and independent state ground barring

habeas review of ineffective assistance of trial counsel claim where alleged error was particularly

well-established in the trial record; trial counsel "plainly failed to object on inconsistency

---

[4]      "Notwithstanding the provisions of subdivision one [of C.P.L. § 440.10], the court must deny a motion to vacate a judgment when: (c) [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him[.]" N.Y. Crim. Proc. Law § 440.10(2)(c).

grounds to charging the counts in the conjunctive"); *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.

1997) (holding that state court's reliance on C.P.L. § 440.10(2)(c) barred habeas review of

ineffective assistance claim on trial counsel's failure to object to a jury charge; trial record

provided a sufficient basis for the claim, which did not fall within any of the exceptions noted by

the New York courts); *Aparicio v. Artuz*, 269 F.3d 78, 91, 93 (2d Cir. 2001) (holding that C.P.L.

§ 440.10(2)(c) barred habeas petition claiming ineffective assistance of trial counsel based on

failure to object on double jeopardy grounds where the petitioner unjustifiably failed to raise the

ineffective assistance issue on direct appeal).

Although trial counsel should not be expected to argue his or her own ineffectiveness on

direct appeal, here Minigan had new appellate counsel. As in *Sweet v. Bennett* and the other

Second Circuit cases cited above, trial counsel's alleged errors are particularly well-established

in the trial record. Indeed, Minigan's "ineffectiveness claim presents almost a paradigmatic

example of a trial record that plainly establishes the basis for an argument that counsel's

performance was deficient and prejudicial [since] [c]ounsel's failure to object [to the alleged

errors during jury selection and jury deliberations] is preserved in the trial record," *Sweet*, 353

F.3d at 141.

The conclusion that Minigan's ineffective assistance claims are procedurally defaulted

does not end the Court's analysis for, as discussed above, a habeas petitioner may avoid such a

default as this by showing cause for the default and prejudice, or that failure to consider the claim

will result in miscarriage of justice. *See Coleman v.Thompson*, 501 U.S. at 748; *Murray v.*

*Carrier*, 477 U.S. at  496; *Aparicio v. Artuz*, 269 F.3d at 90. Minigan has not argued cause and

prejudice explicitly in his habeas pleadings filed in this Court. The Court notes, however, that

Minigan's argument, raised in support of his *coram nobis* application, that his appellate counsel

provided constitutionally ineffective assistance in failing to raise the ineffective assistance of trial

counsel[5] could arguably constitute cause for his failure to exhaust that claim in the state courts.

*See Doleo v. Reynolds*, No. 00 CIV.7927IAKH, 2002 WL 922260, *4 (S.D.N.Y. May 7, 2002)

(citing *McCleskey*, 499 U.S. at 494) ("In addition, constitutionally '[i]neffective assistance of

counsel . . . is cause.' Attorney error short of ineffective assistance of counsel, however, does not

constitute cause and will not excuse a procedural default. Once the petitioner has established

cause, he must show 'actual prejudice' resulting from the errors of which he complains.'")

(quoting *United States v. Frady*, 456 U.S. 152, 168, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816

(1982)).

Minigan, however, has failed to show that he suffered any prejudice resulting from

appellate counsel's failure to raise the ineffectiveness of trial counsel on appeal since none of the

alleged instances of trial counsel's incompetence, taken singly or together, would have persuaded

the Appellate Division to reverse his conviction. In other words, Minigan cannot establish that

appellate counsel was constitutionally ineffective: A petitioner alleging ineffective assistance of

appellate counsel must prove both that appellate counsel was objectively unreasonable in failing

to raise a particular issue on appeal, and that absent counsel's deficient performance, there was a

reasonable probability that defendant's appeal would have been successful. *Mayo v. Henderson*,

13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert.*

---

[5]       Minigan asserted, "Who knows what the results would have been had Appellate Counsel raised the
"Ineffective Assistance of Trial Counsel, based on all the grounds and issues, (*Batson* Issue; *Ex Parte*
Communication of Judge and Deliberating Juror; *Inter alia*, in Present 440.10 Motion; and herein raised and
developed as following arguments with 'EXCEPTIONS TAKEN' . . ." Resp'p App. Z at 384.

*denied*, 508 U.S. 912 (1993)); *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir. 2001).

First, as to trial counsel's failure to challenge the racial composition of his jury panel, Minigan has not demonstrated a *prima facie* showing of a viable "fair cross section" claim under the Sixth Amendment or the Equal Protection Clause.  To establish a *prima facie* case under the Sixth Amendment, the movant must demonstrate that the under-representation of the racial the group claimed to be excluded is the result of "systematic exclusion of the group in the jury selection process." *Duren v. Missouri*,  439 U.S. 357, 364, 99 S. Ct. 664, 668-69, 58 L. Ed.2d 579 (1979). Under the Equal Protection Clause, the moving party also bears the burden of showing that the selection procedure is not racially neutral, *i.e.*, is the result of intentional discrimination by the state. *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir. 1986); *Castaneda v. Partida*, 430 U.S. 482, 494-95, 97 S. Ct. 1272, 51 L. Ed.2d 498 (1977).

The lone fact Minigan set forth in support of his "fair cross section" claim is that "only two of the eight-member panel were black[.]" Pet'r Mem. at 5 (Docket No. 2). This is plainly insufficient to show the jury selection process as a whole for criminal trials in Monroe County systematically excluded blacks, let alone that there was intentional discrimination on the part of the state officials responsible for administering the jury selection system. *See Veliz v. Crown Lift Trucks*, 714 F. Supp. 49, 55 (E.D.N.Y. 1989) ("In his motion papers, plaintiff notes only that he is a member of a distinctive group and claims, without any evidentiary support, that only one of the forty persons in the venire from which the jury was chosen was hispanic. (Defendant challenges this latter assertion.) Plaintiff, however, ignores the second prong of the *Duren* test, as he has submitted no statistical evidence with respect to (1) the number of hispanics in the Eastern

District of New York, (2) the number of hispanics in the venires in the Eastern District at the

time of trial, or (3) the number of hispanics in the jury pool from which the venire in this case

was selected. Since the burden is on the party challenging the jury selection process to present

statistical proof of underrepresentation, *see United States v. Brady*, 579 F.2d 1121, 1134 (9th

Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979), plaintiff's challenge

must fail."); *see also United States v. Dioguardi*, 332 F. Supp. 7, 20 (S.D.N.Y. 1971) (dismissing

motion challenging racial composition of grand jury panel where "only support for his motion

consist[ed] of counsel's affidavit that '[s]uffice it to say that the percentage of black persons,

persons of Puerto Rican origin and descent, and of other minority groups, do not seem on the

surface to be adequately represented in the panel of Grand Jurors'"; movant "failed to meet his

burden of showing that the method of grand jury selection is not reasonably designed to assure a

representation of a fair cross-section of the community"). Thus, Minigan has not come forward

with any relevant statistics to persuade this Court that trial counsel had a colorable basis on

which to challenge the jury panel at Minigan's trial.

Second, the *Batson* challenge that Minigan claims trial counsel should have made, in all

likelihood, would have been rejected by the trial court and the appellate court. Minigan asserts

that trial counsel should have raised a *Batson* argument when the prosecutor apparently

peremptorily excused juror Dixon, one of the two black jurors on the panel.[6]

To establish a *prima facie* case under *Batson v. Kentucky*, the moving party must

demonstrate that the circumstances give rise to an inference that the prospective juror was struck

---

[6]         Minigan represents that the other black juror was removed by the trial court for cause. *See* Pet'r Mem. at 7 (Docket No. 2). The challenges for cause and peremptory challenges unfortunately were not placed on the record.

because of his or her race. 476 U.S. 79, 84, 106 S.Ct. 1712, 90 L. Ed.2d 69 (1986); *accord*

*Galarza v. Keane*, 252 F .3d 630, 636 (2d Cir. 2001). Second, if the trial court finds that the party

making the *Batson* challenge has established a *prima facie* case, it must require the non-moving

party to proffer a race-neutral explanation for striking the potential juror. *Id.* Finally, if the

non-moving party proffers a race-neutral explanation, the trial court must determine whether the

moving party has carried his or her burden of proving by a preponderance of the evidence that the

strike was "motivated by purposeful discrimination." *Id.* Here, the Court assumes for the sake of

argument that Minigan would have been able set forth a *prima facie* case. Had the prosecutor

been asked for a race-neutral reason he, in all likelihood, would have pointed to the fact, as

disclosed in the record, that Ms. Dixon expressed dissatisfaction with the way she had been

treated by the police in the past when she had been burglarized. Having a negative experience

with law enforcement is a facially neutral reason, meaning that Minigan would have had to

demonstrate, by a preponderance of the evidence, that the reason was a pretext or, in other words,

that "purposeful discrimination" was behind the peremptory strike. In this Court's opinion, it is

highly unlikely that Minigan would have been able to carry his burden.  Since "[t]he credibility

of an attorney offering a race-neutral explanation is at the very heart of [the] analysis," *Barnes v.*

*Anderson*, 202 F.3d 150, 157 (2d Cir. 1999), the reviewing court "ordinarily should give [the trial

court's] findings great deference." *Batson v. Kentucky*, 476 U.S. at 98 n.21; *accord Hernandez v.*

*New York*, 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Here, Dixon appears to

have been the only juror who previously had been a victim of a crime or who had involvement

with the police and who expressed dissatisfaction with the way she had been treated by the

police. Thus, this was a basis to distinguish Dixon from other similarly situated jurors,

undermining Minigan's claim of pretext. In sum, trial counsel did not have a particularly strong basis for asserting a *Batson* claim and, in any event, may have had a strategic reason for declining to challenge the dismissal of juror Dixon.

Third, the claim that trial counsel should have objected to the "*ex parte*" communication between the trial court and a deliberating juror would not have been successful on direct appeal. After the jury had been deliberating for a little over four hours, at 9:10 p.m., court reconvened to place a matter on the record:

| | |
|---|---|
| The Court: | The record should indicate that we received a phone call from Frank Logan, the husband of Ms. Logan, juror number 6, to the effect that his mother had died, that she lives in Rhode Island, that he wanted his wife to accompany him to Rhode Island. In the second phone call, Mr. Logan indicated that he was willing to go to Rhode Island without his wife. He indicated he would like to tell his wife what had happened. In my presence, Ms. Logan called her husband. The conversation in my presence concerned strictly arrangements for him to attend his mother's funeral. I questioned Ms. Logan after the conversation. She said she was willing to continue deliberations. I also talked to Mr. Logan previously. He indicated that if his wife wanted to continue deliberations it was agreeable with him, also. He would proceed to Rhode Island if he had to. Ms. Logan indicated she wants to continue deliberations. She wanted a brief period to compose herself, which she had. She is now ready to continue deliberations. |
| Mr. Huether: | Did she indicate, also, to you she felt there would be no impediment to serve as a juror under these circumstances. |
| The Court: | Yes. I questioned her several times. I also told her if the situation changed later on this evening, she felt she could not continue deliberations, she should advise me and we would made arrangements. Anything you want to add, Mr. Murante [defense counsel]? |
| Mr. Murante: | No. Nothing. |
| The Court: | You are satisfied with the procedure thus far? |
| Mr. Murante: | As long as you asked, I would note I discussed it with my client. You discussed it with me before the procedure occurred, and I consented to it. |

T.1024-25.

"A defendant's presence at a particular point in the proceedings against him is required only if his "'presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . .[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 108, 54 S.Ct. 330, 332, 333 (1934)). On this record, Minigan has failed to establish that his rights were violated by the *in camera* discussion between the trial judge and Mrs. Logan as he has not shown what he would have gained by attending. *See Gagnon*, 470 U.S. at 527.

Minigan submits that the "adverse effect" of the death of Mrs. Logan's mother-in-law on the integrity of the jury deliberations is apparent based on "the return of the jury less than half an hour after resumption of deliberation, coupled with the observable in court demeanor of juror Logan[.]" This is nothing more than pure speculation. Furthermore, as a matter of state law, Minigan did not have an absolute right to be present during this *in camera* inquiry, as he has failed to show that his absence had any effect whatsoever on his opportunity to defend himself. *E.g.*, *People v. Paccione*, 295 A.D.2d 450, 450, 743 N.Y.S.2d 561, 562 (App. Div. 2d Dept. 2002) ("Contrary to the appellant's contention, he did not have a right to be present during the court's inquiry into juror number seven's avowed hostility. An in-camera inquiry by the court into an impaneled juror's continuing fitness to serve is not a core segment of trial, and reversal is mandated only if the [appellant's] absence might have had an effect on the opportunity to defend.") (quotation marks and citations omitted; alteration in original).

-37-

Fourth, Minigan's claim that trial counsel was ineffective in failing to challenge an allegedly biased juror was not likely to have been successful on direct appeal. Minigan points to the following colloquy between defense counsel and Juror Kole as evidence that she was incapable of being impartial:

| | |
|---|---|
| Mr. Murante: | That brings me to an area of the case I am concerned about anyway here. Immediately before this incident occurred, my client ingested cocaine. I don't know how you take it in – snort it in, swallow it. Terrible things, drugs and alcohol abuse in our country today. It has affected our citizens. It is a highly emotional issue. If the evidence establishes some alcohol or drug abuse on my client's part, would that so cause you to lose sight of objectivity that you couldn't objectively and rationally, dispassionately listen to the testimony without regard to passion, fear and favor? Would it cause you a problem? |
| Juror Kole: | Yes, it would. |
| Mr. Murante: | To the point where you couldn't be fair and objective? |
| Juror Kole: | I couldn't answer that. |
| Mr. Murante: | I don't have to ask you for an answer. When the time comes you are going to have to take an oath. |
| Juror Kole: | It is possible, I couldn't say 100 percent. |
| Mr. Murante: | Thank you very much. |

T.152-53. Minigan neglects to acknowledge that Juror Kole earlier had said that she could not think of any reason why she could not sit as a juror at Minigan's trial, had promised to listen to the prosecutor's arguments in the same way she would listen to defense counsel's, and had promised to listen to all the witnesses before making a decision. T.130-31. In light of those representations, it does not appear to this Court as though defense counsel could have succeeded in having that juror stricken from the panel for cause. *E.g.*, *Tolliver v. Greiner*, No. CIV. 902CV0570LEKRFT, 2005 WL 2179298, at *6 (N.D.N.Y. Sept. 8, 2005) (a potential juror stated during *voir dire* that he would assume that a person who illegally possessed a gun would be more likely to have committed a murder; habeas court rejected argument that because counsel

-38-

was aware that the proof at trial would establish that he illegally possessed a gun around the time

of the homicide, his trial counsel rendered ineffective assistance by failing to seek the removal of

that juror where promised that he would follow the judge's instructions on the law) (citing

*Chacko v. United States*, NO. 96 CR. 519 (JGK), 00 CIV. 405 (JGK), 2000 WL 1808662, at *8

(S.D.N.Y. Dec. 11, 2000) (trial counsel not ineffective in seeking to remove juror who indicated

that she had good experiences and bad experiences with people of the defendant's ethnicity but

also assured court that she "would be able to decide the case on the facts and the law").

Furthermore, trial counsel's decision not seek the removal of that potential juror through

the exercise of a peremptory challenge arguably was a strategic choice on counsel's part.

*Tolliver*, 2005 WL 2179298, at *6  (citing *Doleo v. Reynolds*, 2002 WL 922260, at *4

("Strategies as to the exercise of peremptories are matters of counsel's intuition, and do not rise

to the level of constitutional error."); *Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989)

("The selection of a jury is inevitably a call upon experience and intuition. . . . Written records

give us only shadows for measuring the quality of such efforts."). As a matter of both state and

federal law regarding the evaluation of claims of ineffective assistance of trial counsel, special

deference is owed to the reasonable strategic decisions made by counsel. *People v. Benevento*, 91

N.Y.2d 708, 712, 697 N.E.2d 584, 587, 674 N.Y.S.2d 629, 632 (N.Y. 1998) ( "[A] reviewing

court must avoid confusing true ineffectiveness with mere losing tactics and according undue

significance to retrospective analysis. Rather, it is incumbent on defendant to demonstrate the

absence of strategic or other legitimate explanations for counsel's alleged shortcomings. . . . To

prevail on a claim of ineffective assistance, defendants must demonstrate that they were deprived

of a fair trial by less than meaningful representation; a simple disagreement with strategies,

tactics or the scope of possible cross-examination, weighed long after the trial, does not suffice.")
(internal citations, quotations and quotation marks omitted); *Strickland v. Washington*, 466 U.S.
668, 690-91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (holding that the strategic choices of trial
counsel "are virtually unchallengable" in habeas corpus proceedings).

For the reasons discussed above, the alleged ineffective assistance of appellate counsel
should not serve as "cause" to excuse the procedural default of Minigan's ineffective assistance
of trial counsel claim because Minigan has failed to demonstrate that appellate counsel's
performance was, in fact, objectively unreasonable, let alone that it actually prejudiced him on
his direct appeal. Furthermore, Minigan has not adduced proof that he is actually innocent of the
charges for which he was convicted; as the Second Circuit and Supreme Court have held, "actual
innocence" means factual innocence rather than just legal insufficiency. Minigan can
demonstrate neither factual innocence nor even legal insufficiency of the evidence, given the
record before this Court. Therefore, the Court recommends that Minigan's claims of ineffective
assistance of trial counsel be dismissed as procedurally barred.

### b.    Perjured testimony was offered by two prosecution witnesses

Minigan contends that his conviction cannot stand because it was based on the "perjured"
testimony of Lt. Joseph and eyewitness Mechel Rollow. In support of this claim, Minigan points
to inconsistencies between the testimony given by these witnesses at the grand jury and at his
trial. This claim was raised in support of Minigan's 1996 C.P.L. § 440.10 motion, and denied by
the trial court based on C.P.L. § 440.10(2)(c) because it was a matter of record and should have
been raised on direct appeal. *See* Resp't App. L at 178-92. Respondent contends that the trial
court's reliance upon C.P.L. § 440.10(2)(c) constitutes an "adequate and independent" state

ground for decision, precluding federal habeas review of the claim. *See* Resp't Mem. at 16
(Docket No. 12).

In this case, as respondent correctly notes, Minigan did not argue in his direct appeal that
Rollow's or Lt. Joseph's testimony was perjured; he only raised this argument in his subsequent
motions to vacate his conviction pursuant to C.P.L. § 440.10. However, each time it was
presented with this claim, the trial court held that the claim was procedurally barred, as the
underlying facts appeared in the record, thereby providing a sufficient basis for Minigan to have
raised his claim on direct appeal.

The Second Circuit has recognized C.P.L. § 440.10(2)(c) as an adequate and independent
state ground sufficient to preclude federal habeas review of a state-court defendant's claims. *See
Sweet v. Bennett*, 353 F.3d at 139; *Reyes v. Keane*, 118 F.3d at 139; *Aparicio v. Artuz*, 269 F.3d
at 91. Specifically in the context of claims of alleged perjury, district courts in this Circuit have
found that a state court's invocation of C.P.L. § 440.10(2)(c) is an adequate and independent
state ground barring habeas review. *Bonilla v. Cunningham*, No. 04-CV-4860 (CBA), 2007 WL
13415, at *3 (E.D.N.Y. Jan. 2, 2007); *Hemphill v. Senkowski*, No. 02 Civ. 7093(DC), 2004 WL
943567, at *9 (S.D.N.Y. May 3, 2004) (holding that perjury claim was procedurally barred
because petitioner did not raise the claim on direct appeal and instead he raised it in his first and
third C.P.L. § 440.10 motions). Thus, Minigan's claim of witness "perjury" should be found to
be procedurally barred.  Minigan has not demonstrated "actual innocence" so as to warrant the
"fundamental miscarriage of justice" exception. Furthermore, Minigan has not shown cause for
the default or that prejudice will resulting should the Court fail to review his perjury claim.

Prejudice, in particular, is lacking here, since Minigan has not even demonstrated the

witnesses in question perjured themselves. The Second Circuit has held that "[i]n order to grant a new trial based on newly discovered evidence of trial perjury, the appellants must first demonstrate that the witness in fact committed perjury." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir.) (citing *United States v. Torres*, 128 F.3d 38, 49 (2d Cir. 1997)), *cert. denied*, 122 S.Ct. 1946 (2002). The Second Circuit has distinguished actual perjury–the giving of "false testimony concerning a material matter with the willful intent to provide false testimony"–from merely "incorrect testimony resulting from confusion, mistake, or faulty memory." *Id.* (citing *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). Moreover, the existence of "[s]imple inaccuracies or inconsistencies" in a witness' testimony, standing alone, "do not rise to the level of perjury." *Id.* (citing *United States v. Sanchez*, 969 F.2d 1409, 1414-15 (2d Cir. 1992) ("Differences in recollection alone do not add up to perjury.") (in turn citing *United States v. Bortnovsky*, 879 F.2d 30, 33 (2d Cir. 1989); *United States v. Sprayregen*, 577 F.2d 173, 175 (2d Cir.), *cert. denied*, 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978)).

In the present case, Minigan has done nothing more than merely point to alleged inconsistencies in Rollow's testimony at trial and alleged discrepancies in Lt. Joseph's testimony at the pre-trial suppression hearing and at trial. "Under the circumstances of this case, the differences in testimony presented a credibility question for the jury, at most." *Sanchez*, 969 F.2d at 1415 (citing *United States v. Miranne*, 688 F.2d 980, 989 (5th Cir. 1982), *cert. denied*, 459 U.S. 1109, 103 S.Ct. 736, 74 L.Ed.2d 959 (1983)).

For the foregoing reasons, Minigan's claim that two prosecution witnesses committed perjury should be dismissed.

### c.      Insufficiency of the evidence

Related to his claim of perjury is Minigan's claim that the evidence against him was legally insufficient to support the verdict against him. Minigan contends that the testimony of the alleged perjurers, Rollow and Lt. Joseph, "hardly provided the necessary probative force necessary to conclude that petitioner was guilty beyond a reasonable doubt." Pet'r Mem. at 31 (Docket No. 2). In addition, Minigan contends that the prosecutor failed to present evidence that Minigan and Mains had a "plan" to rob the victim or that Minigan was aware that Mains possessed a weapon or shared Mains' intent.

This claim, like most of Minigan's claims, was raised in his various C.P.L. § 440.10 motions and dismissed by the trial court on the basis of the procedural bar rule contained in C.P.L. § 440.10(2)(c). As respondent argues, it therefore is procedurally defaulted. To the extent that Minigan may be asserting that his appellate counsel's ineffectiveness in failing to raise this claim on direct appeal constitutes "cause" to excuse the default, the Court rejects this argument for the reasons discussed below.

Under both New York state and federal law, a defendant bears heavy burden in seeking to overturn his conviction on the basis of insufficient evidence. *Cohen v. Hallmark Cards*, *Inc*, 45 N.Y.2d 493, 499, 382 N.E.2d 1145, 1148, 410 N.Y.S.2d 282, 285) (N.Y. 1978) ("For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence, however, requires a harsher and more basic assessment of the jury verdict. It is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial."); *accord People v. Bleakley*, 69 N.Y.2d 490, 495, 508 N.E.2d 672, 675, 515 N.Y.S.2d 761,

763 (N.Y. 1987); *see also Einaugler v. Supreme Court*, 109 F.3d 836, 840 (2d Cir.1997) (stating

that a habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of the

evidence in a state criminal conviction under *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct.

2781, 61 L. Ed.2d 560 (1979)); *Gruttola v. Hammock*, 639 F.2d 922, 927 (2d Cir. 1981) ("[T]he

standard enunciated in *Jackson* remains a difficult one for petitioners to meet.").

To the degree Minigan claims that his guilt was not proven beyond a reasonable doubt,

the only relevant question for this Court is whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. First, Minigan's argument that

the prosecution did not present evidence of a criminal "plan" between him and Mains is

unavailing; accessorial liability under Penal Law § 20.00 clearly does not require that co-

defendants have formed a scheme before committing the offense at issue. Second, Minigan's

arguments that the prosecution's witnesses' were unworthy of belief merely repeat arguments

already presented to, and rejected by the jury. Trial counsel vigorously attacked the credibility of

both of the witnesses on cross-examination. However, the jury determined to credit the testimony

offered by Rollow and Lt. Joseph, notwithstanding any inconsistencies in that testimony. In the

context of a challenge to the sufficiency of the evidence, a reviewing court may not attempt to

second-guess a jury's credibility determination. *United States v. Florez*, 447 F.3d 145, 156 (2d

Cir. 2006) (rejecting insufficiency-of-the-evidence claim where defendant challenged the

accomplices' credibility based on their plea agreements with the government and their long

histories of criminal and dishonest behavior) (citing *United States v. Autuori*, 212 F.3d 105, 118

(2d Cir. 2000) ("It is not for the court on a Rule 29 motion to make credibility determinations . . .

."); *United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cir. 1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and we are not entitled to second-guess the jury's assessments.")). Rather, the Court must "assume that the jury 'resolve[d] all issues of credibility in favor of the prosecution.'" *Id.* (quoting *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986) (alteration in original)); *see also Gruttola v. Hammock*, 639 F.2d at 927 ("[Petitioner] Gruttola's attempt to describe the police officers' testimony as a 'cover up' was an attack on the credibility of these witnesses, a matter settled by the jury."). The rule likewise is well-settled as a matter of New York state law that the credibility of witnesses and the weight afforded each item of evidence is within the province of the jury, and its determination will not be disturbed lightly on appeal. *See*, *e.g.*, *People v. Gruttola*, 43 N.Y.2d 116, 122-23, 371 N.E.2d 506, 509, 400 N.Y.S.2d 788, 791 (N.Y. 1977) ("Issues of credibility are primarily for the jury . . . .The allegations of the defendant merely challenge the credibility of the witnesses and place in dispute only findings of fact made by the jury and unanimously affirmed by the Appellate Division. But this court is without power to review determinations of fact unless it can be said, as a matter of law, that they are unsupported, or that they are incredible[.]") (internal citations omitted); *People v. Isles Bangola*, 304 A.D.2d 590, 590, 758 N.Y.S.2d 138, 139 (App. Div. 2d Dept. 2003).  Furthermore, there was more than sufficient evidence to find Minigan guilty as an accessory to the robbery and murder, even without Lt. Joseph's testimony that Minigan admitted to striking Jopson himself.

On direct appeal, appellate counsel raised a weight-of-the-evidence claim; appellate courts in New York are statutorily empowered to conduct such review, which is a more generous standard for defendants. To determine whether a verdict is supported by the weight of the

evidence, a New York state appellate court's analysis is not limited to the test for legal

sufficiency. Thus, even if all the elements and necessary findings are supported by *some* credible

evidence, the state appellate court must examine the evidence further. If, based on "all the

credible evidence a different finding would not have been unreasonable, then the appellate court

must, like the trier of fact below, weigh the relative probative force of conflicting testimony and

the relative strength of conflicting inferences that may be drawn from the testimony[.]" *Id.*

(quotation omitted). Minigan's appellate counsel clearly made a reasonable strategic choice to

pursue exclusively a weight-of-the-evidence claim, which afforded his client a relatively greater

chance of success than an insufficiency-of-the-evidence claim. As discussed above, appellate

counsel's arguments would have been limited to attacking the credibility of the witnesses, which

is plainly inadequate to carry the defense burden on a claim of insufficient evidence. Because

such a claim had virtually no chance of success on direct appeal, Minigan was not prejudiced by

appellate counsel's failure to raise such a claim. Accordingly, any alleged ineffectiveness of

Minigan's appellate counsel cannot serve as "cause" to excuse the procedural default of his

insufficient evidence claim. Furthermore, prejudice is lacking, as well; the standard for "legal

sufficiency" is essentially the same under both state and federal law, meaning that Minigan's

insufficient evidence claim likewise would not have been successful on habeas review. Having

found no basis to overlook the procedural default of the insufficiency-of-the-evidence claim, the

Court recommends that it be dismissed.

### d.      Erroneous jury instructions

Minigan contends that the trial court "effectively eliminated the element of intent from

the People's burden of proof." Pet'r Mem. at 53 (Docket No. 2). According to Minigan, the trial

judge, "when responding to the jury's request for a further explanation as to what constituted intent, prejudiced the issue by re-describing his interpretation of intent." *Id.* (citing T.1018). This claim, which was asserted in support of Minigan's various motion pursuant to C.P.L. § 440.10 is, as respondent argues, procedurally defaulted due to the trial court's reliance on C.P.L. § 440.10(2)(c) in dismissing the claim.

Neither cause for the default, nor prejudice resulting therefrom, is discernible on the record before the Court. In any event, the Court observes that Minigan's claim is wholly unsupported by the record. The error about which Minigan complains is actually the fourth element of the "non-killer" affirmative defense; the jurors wished to know "[w]hen does intent come in[?]" T.1017. The trial court responded that there was "no intent" involved; rather the fourth element was "that the defendant had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious injury." T.1018. The juror, apparently still uncertain as to the court's meaning, asked, "Intended?" At that point, there was an off-the-record colloquy among the court and counsel, outside the presence of the jury.

When the jury was recalled, the trial judge stated, "To hopefully answer the latest question: The issue you have to determine as a jury is if at any time prior to the commission of a criminal act by Mr. Mains, did Mr. Minigan have reasonable ground to believe that Mr. Mains was going to engage in that criminal conduct." T.1018. The jurors indicated that explanation, about which Minigan now complains, was satisfactory. *Id.* What Minigan neglects to mention is that trial counsel noted that although he initially felt comfortable with the court's additional explanation, he was concerned that "the jury is going to conclude that [his] client has to have reason to believe as to Mains' intent immediately prior to the homicidal act, as opposed to any

acts commencing the criminal venture itself." T.1019. Further argument between defense counsel

and the prosecutor ensued. The trial court ultimately agreed with defense counsel, and recalled

the jury to give them an instruction drafted by counsel. T.1023-24. That instruction stated as

follows:

> Members of the jury, to hopefully further clarify the last question: The fourth
> element is, at any time prior to the commencement of the criminal venture, that is,
> the robbery, that Mr. Minigan had no reasonable ground to believe that Mr. Mains
> intended to engage in conduct likely to result in death or serious physical injury to
> the alleged victim. Are you satisfied with that further explanation. You may
> continue your deliberations.

T.1023-24. This Court, therefore, is mystified as to why Minigan is asserting error when trial

counsel argued for, and obtained, a jury charge more favorable to his client. This claim should be

dismissed.

### e.        Failure to charge the jury on lesser included offenses

Minigan argues that the trial court, despite being requested to do so by defense counsel,

refused to submit to the jury the lesser included offense of second degree assault and third degree

robbery. Pet'r Mem. at 52 (Docket No. 2). Contrary to Minigan's assertion, it does not appear

that trial counsel requested any lesser included offenses. *See* T.864-65.[7] In any event, this claim,

raised in support of Minigan's various motions pursuant to C.P.L. § 440.10 is, as respondent

argues, procedurally defaulted due to the trial court's reliance on C.P.L. § 440.10(2)(c) in

dismissing the claim. As with the rest of Minigan's procedurally defaulted claims, neither cause

---

[7]        *See Rios v. United States*, No. CV-91-4384, 1992 WL 328931 at *6-7 (E.D.N.Y. Oct. 13, 1992)
("Courts have declined to find ineffective assistance of counsel where counsel pursues an exculpatory defense
although such a choice practically precludes a request for an instruction on a lesser included offense. . . . The tactical
decision to pursue a complete, exculpatory defense rather than a partial one enjoys substantial deference. . . . Having
presented no evidence on a partial defense, counsel had no reason or basis to request an instruction on the lesser
included offense.")).

nor prejudice is discernible on the record before the Court.

Moreover, Minigan's claim that the trial court erroneously failed to charge the jury on lesser included offenses arguably is not cognizable on federal habeas review of a non-capital conviction because it does not implicate a federal constitutional right. Neither the Supreme Court nor the Second Circuit has held that a court's failure to instruct a jury on lesser included offenses in a non-capital case is a constitutional issue that may be considered in a habeas petition. *Knapp v. Leonardo*, 46 F.3d 170, 179 (2d Cir. 1995). Only violations of a right guaranteed under the federal constitution are redressable in a habeas corpus proceeding. *See Estelle v. McGuire*, 502 U.S. at 68; 28 U.S.C. § 2254(a). Furthermore, in *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996) (*per curiam*), the Second Circuit held that interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule. Therefore, the non-retroactivity doctrine set forth in *Teague v. Lane*, 489 U.S. 288, 305-08 (1989), precluded its consideration of the issue on habeas review. *Accord*, *e.g.*, *Sullivan v. O'Keefe*, No. 00 CIV. 2292(SAS), 2000 WL 1072304, at *5 (S.D.N.Y. Aug. 2, 2000) (declining to review on habeas petitioner's claim that trial court erroneously failed to submit lesser included offenses to jury).

Upon a review of the trial court record, however, the Court concludes that a lesser included charge would have been inappropriate. Under New York law, an instruction on a lesser included offense must be given to the jury where (1) it is theoretically impossible to commit the greater crime without committing the lesser and (2) a reasonable view of the evidence would permit the jury to find that the defendant had committed the lesser, but not the greater, offense. *People v. Glover*, 57 N.Y.2d 61, 63, 439 N.E.2d 376, 377, 453 N.Y.S.2d 660, 661 (N.Y. 1982)

(*per curiam*); *see also People v. Green*, 56 N.Y.2d 427, 430, 437 N.E.2d 1146, 1147-48, 452 N.Y.S.2d 389, 391 (1982); N.Y. Crim. Proc. Law § 300.50(1).

Assault in the second degree requires a specific *mens rea–i.e.*, intent to cause serious injury (N.Y. Penal Law § 120.05(1))–or, when a deadly weapon is used, intent to cause physical injury (N.Y. Penal Law § 120.05(2)). Felony murder, on the other hand, "is a strict liability offense requiring no *mens rea*[.]" *People v. Langlois*, 17 A.D.3d 772, 774, 792 N.Y.S.2d 713, 715 (App. Div. 3d Dept. 2005) (citing *People v. Curry*, 294 A.D.2d 608, 609, 741 N.Y.S.2d 324, *appeal denied*, 98 N.Y.2d 674, 746 N.Y.S.2d 463, 774 N.E.2d 228 (N.Y. 2002)). Therefore, because it was *not* theoretically impossible to commit felony murder without also committing the lesser offense requested by defendant to be charged to the jury, the trial court properly did not issue such a charge. *See id.*

As to the trial court's failure to charge third degree robbery (N.Y. Penal Law § 160.05), Minigan argues that the knife used in the homicide "was not connected to petitioner and the jury could well have concluded, without resorting to sheer speculation, that the element of force utilized in the robbery was the act of physical grabbing and not the use of a knife." Pet'r Mem. at 52. (Docket No. 2). By definition, the crime of robbery in the third degree is a lesser included offense of robbery in the first degree under the first prong of the test detailed in *People v. Glover*, 57 N.Y.2d at 63. *E.g.*, *People v. Blair*, 148 A.D.2d 767, 768, 538 N.Y.S.2d 344, 346 (App. Div. 3d Dept. 1989). However, in Minigan's case, the second *Glover* prong was not satisfied since the testimony did not provide a reasonable view of the evidence requiring such a lesser charge. In particular, there was no reasonable view of the evidence to suggest that the Minigan or Mains did *not* use a knife during their attack on Jopson. *See People v. Aquendo*, 213 A.D.2d 208, 208, 623

N.Y.S.2d 248, 249 (App. Div. 1ˢᵗ Dept. 1995) ("The court properly refused to charge the lesser included offenses of robbery in the third degree and burglary in the second degree since there was no reasonable view of the evidence to suggest that defendant did not use a knife during the incident[.]") (citation omitted). Although there was evidence that Jopson sustained a number of wounds that appeared to have been inflicted by someone's fists, the fact remains that the victim also suffered several stab wounds, one of which was fatal. Furthermore, it matters not whether the prosecution could prove that Minigan actually wielded the knife because Minigan was charged with accessorial liability, *see* N.Y. Penal Law § 20.00. In any event, the Court does not see how charging a lesser degree of robbery would have assisted Minigan, since third degree robbery still could have served as the underlying felony to support the felony murder charge. *See* N.Y. Penal Law § 125.25(3) ("Acting either alone or with one or more other persons, he commits or attempts to commit robbery, burglary, kidnapping, arson, rape in the first degree, . . . , and, in the course of and in furtherance of such crime . . . , he or another participant . . . , causes the death of a person other than one of the participants . . . .").

Thus, as a matter of New York state law, Minigan was not entitled to have the jury charged with the lesser included offenses of second degree assault or third degree robbery. That alone negates a finding that his appellate counsel was ineffective in failing to raise such a claim on direct appeal, and therefore appellate counsel's ineffectiveness cannot serve as the "cause" to excuse the procedural default of this claim.

For the foregoing reasons, this claim should be dismissed as procedurally defaulted. Furthermore, even if it were cognizable on federal habeas review, it is plainly without merit and can be dismissed on that basis as well.

**IV.     CONCLUSION**

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by Frank Minigan, Jr. be **DENIED**. Furthermore, the Court believes that Minigan has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). Therefore, the Court recommends that no Certificate of Appealability should issue with respect to any of Minigan's claims.


/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  February 16, 2007
          Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: Buffalo, New York
February 16 , 2007.